**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| GUY MOAR, derivatively on behalf of COTY INC., <br><br> Plaintiff, <br><br> v. <br><br> SUE NABI, LAURENT MERCIER, BEATRICE BALLINI, PATRICIA CAPEL, JOACHIM CREUS, FRANK ENGELEN, PETER HARF, ANNA MAKANJU, ISABELLE PARIZE, ROBERT SINGER, MARKUS STROBEL, and GORDON VON BRETTEN, <br><br> Defendants, <br><br> and <br><br> COTY INC., <br><br> Nominal Defendant. | Case No.: 1:26-cv-02931 <br><br><br> **DEMAND FOR JURY TRIAL** |

**<u>VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT</u>**

Plaintiff Guy Moar ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of Nominal Defendant Coty Inc. ("Coty" or the "Company"), files this Verified Shareholder Derivative Complaint against defendants Sue Nabi ("Nabi"), Laurent Mercier ("Mercier"), Beatrice Ballini ("Ballini"), Patricia Capel ("Capel"), Joachim Creus ("Creus"), Frank Engelen ("Engelen"), Peter Harf ("Harf"), Anna Makanju ("Makanju"), Isabelle Parize ("Parize"), Robert Singer ("Singer"), Markus Strobel ("Strobel"), and Gordon von Bretten ("von Bretten") (collectively, the "Individual Defendants," and together with Coty, the "Defendants") for breaches

of their fiduciary duties as directors and/or officers of Coty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and against Defendants Nabi and Mercier for contribution under Section 10(b) and 21D of the Exchange Act. As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by the Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Coty, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## **NATURE OF THE ACTION**

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by the Individual Defendants from August 20, 2025, through February 6, 2026, both dates inclusive (the "Relevant Period").

2.      Coty was founded in 1904 and has since become among the world's largest beauty companies. As such, the Company offers various products including fragrances, color cosmetics, and skin and body care. Coty operates through two segments: Prestige Beauty and Consumer Beauty.

3.      Prestige Beauty encompasses so-called "prestige" or luxury products and includes brands such as Burberry, Calvin Klein, Gucci, Hugo Boss, and numerous others. Consumer Beauty

is aimed at a more general, wider customer base and includes brands such as Adidas, Vera Wang, and David Beckham.

4.      Throughout the Relevant Period, the Individual Defendants either made or caused the Company to make a series of false and misleading statements pertaining to the Company's financial guidance, particularly regarding continued improvement of sales in both of its business segments.

5.      For example, on November 5, 2025, the Company issued a press release which announced the first quarter results for Fiscal Year 2026.[1] The press release provided, *inter alia*, guidance and expectations for the second quarter for Fiscal Year 2026. Providing an optimistic view, particularly in the Prestige Beauty Segment, the press release stated, "With strong sales delivery in the month of October, particularly in Prestige, Coty expects ***Q2 LFL sales to be at the more favorable end of prior guidance of a LFL decline of -3% to -5%, with sequential trend improvement in both Prestige and Consumer Beauty***."[2]

6.      Defendant Nabi was quoted as providing an outlook of the company that suggested the business trends were improving and the Company could expect sales and profit growth in the second half of Fiscal Year 2026, stating "***Coty's underlying business trends are already improving, in line to slightly ahead of our expectations, particularly in Prestige.***"

7.      The truth emerged during after-market hours on February 5, 2026, when the Company published a press release and held an earnings call announcing its financial results for the second quarter of Fiscal Year 2026. Both the press release and earnings call reported, *inter*

---

[1] Coty's fiscal year does not mirror the calendar year, but instead begins on July 1 and ends on June 30 of the following year.
For the period between July 1, 2024 and June 30, 2025, "Fiscal Year 2025."
For the period between July 1, 2025 and June 30, 2026, "Fiscal Year 2026."
[2] All emphasis has been added unless otherwise noted herein.

*alia*, disappointing financial figures for the six months ended December 31, 2025, as compared year-over-year to the six months ended December 31, 2024. The Company also withdrew its prior full year Fiscal Year 2026 guidance for EBITDA and free cash flow, solely providing guidance for the third quarter of Fiscal Year 2026.

8.      On this news, the price of the Company's common stock fell $0.49 per share, or approximately 15.6%, from a closing price of $3.15 per share on February 5, 2026, to close at $2.66 per share on February 6, 2026. Over the course of the Relevant Period, the price of the Company's common stock fell $2.20 per share, or approximately 45.2%, from a closing price of $4.86 per share on August 20, 2025, to close at $2.66 per share on February 6, 2026.

9.      During the Relevant Period, the Individual Defendants breached their fiduciary duties as officers and directors of the Company by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*, that: (1) the Company's business segments exhibited significant operational inefficiencies; (2) the Company's marketing efforts constricted the margins for its Consumer Beauty Segment; (3) as a result, the Consumer Beauty Segment was underperforming; (4) the Prestige Beauty Segment's growth was slowing; (5) as a result of the foregoing, the Company's assertions concerning its financial and growth prospects were incorrect; and (6) the Company failed to maintain internal controls. As a result of the foregoing, Coty's public statements were materially false and misleading at all relevant times.

10.      Additionally, in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain adequate internal controls.

11.     The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

12.     In light of the Individual Defendants' misconduct—which has subjected the Company, its former Chief Executive Officer ("CEO"), and its Chief Financial Officer ("CFO") to a federal securities fraud class action lawsuit pending in the United States District Court for the Southern District of New York (the "Securities Class Action") and which has further subjected the Company to the need to undertake internal investigations, the need to implement adequate internal controls, losses from the waste of corporate assets, and losses due to the unjust enrichment of the Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein—the Company will have to expend many millions of dollars.

13.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, of their collective engagement in fraud, of the substantial likelihood of the directors' liability in this derivative action, of Defendant Nabi's, Defendant Mercier's, and the Company's liability in the Securities Class Action, their being beholden to each other, their longstanding business and personal relationships with each other, and of their not being disinterested or independent directors, a majority of the Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## **JURISDICTION AND VENUE**

14.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act (15 U.S.C. § 78(n)(a)), Rule 14a-9 of the Exchange Act (17 C.F.R. § 240.14a-9), and Section 10(b) and Section

21D of the Exchange Act (15 U.S.C. § 78u-4(f)). Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

15.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

16.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

17.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, one or more of the Defendants resides or maintains executive offices in this District, and the Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

## PARTIES

### Plaintiff

18.     Plaintiff is a current shareholder of Coty. Plaintiff has continuously owned Company common stock since first purchasing shares of Company stock on May 10, 2021.

### Nominal Defendant Coty

19.     Coty is a Delaware corporation with its principal executive offices at 350 Fifth Avenue, New York, New York 10118. Coty's common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "COTY."

### Defendant Nabi

20.     Defendant Nabi served as a director and CEO of the Company from September 2020 until December 31, 2025.

6

21.    The Schedule 14A the Company filed with the SEC on September 26, 2025, as revised on September 30, 2025 (the "2025 Proxy Statement") stated the following about Defendant Nabi:

**Sue Nabi** joined the Board in September 2020 in connection with her appointment as our Chief Executive Officer. Prior to joining the Company as its Chief Executive Officer, Ms. Nabi was the founder and chief executive officer of the ultra-luxury skincare line, Orveda from 2017. Ms. Nabi began her career at L'Oréal in 1993 and in 2005, she became the Worldwide President of L'Oréal where she helped boost the growth of its makeup brands, and in 2009, she was named the Worldwide President of Lancôme, where she contributed to its revival, including breakthrough product and brand successes, and served until 2013. Ms. Nabi has an Advanced Master's degree in Marketing Management from ESSEC (Paris Business School) and an engineering degree in Agronomy and Environment.

Ms. Nabi brings to our Board her abilities as a global innovator and beauty industry entrepreneur, as well as her 20 years of leadership experience at L'Oreal, including breakthrough product and brand successes, her ability to build and manage diverse, multi-functional global teams and strategic transformations.

**Defendant Mercier**

22.    Defendant Mercier has served as the Company's CFO since February 2021.

23.    The 2025 Proxy Statement states the following about Defendant Mercier:

**Laurent Mercier** has served as Chief Financial Officer and a member of our Executive Committee since February 2021. Mr. Mercier oversees our finance organization. Prior to his appointment as Chief Financial Officer he served as Coty's Deputy CFO since May 2020 and previously as the CFO of Coty's Luxury business since November 2017. Prior to joining Coty, Mr. Mercier worked in finance at Danone, S.A. a leading global food processing group, for 20 years, including serving in the role of VP of Finance for its European Dairy business from 2014 to 2017, CFO of Evian Volvic Germany and CFO for Asia, Middle East and Africa. Mr. Mercier holds a degree from the École Supérieure des Sciences Economiques et Commerciales (ESSEC).

**Defendant Ballini**

24.    Defendant Ballini served as a Company director from September 2019 until March 18, 2026. Defendant Ballini also served as chair of the Remuneration and Nomination Committee.

25.    The 2025 Proxy Statement states the following about Defendant Ballini:

**Beatrice Ballini** joined the Board in September 2019 and has served as the Chair of the RNC since June 2020 and as Lead Independent Director since July 16, 2025. At the end of 2023, Ms. Ballini was named Operating Partner of VAM Investments, a private equity fund. Since September 2023, Ms. Ballini is a member of the board of Gruppo Florence, an integrated manufacturing hub in Italy for the international luxury sector. Until June 30, 2023, Ms. Ballini served as a senior member of the Retail Practice at Russell Reynolds Associates, a global leadership advisory and search firm, where she led the family business services and was a leader of the Board and CEO Advisory Partners group. Prior to joining Russell Reynolds Associates more than 20 years ago, Ms. Ballini was the Chief Executive Officer of a prominent men's clothing manufacturer in Milan where she assisted with the company's strategic growth. Prior to that, she held positions at Goldman Sachs & Co. and Bain & Co. Ms. Ballini has also taught in the Master in Marketing program at Sciences Politiques in Paris and is a member of the European, Middle Eastern, South Asian & African Executive Board of the MIT Sloan School of Management. She holds a laurea degree in chemical engineering from the Polytechnic of Milan, a Master of Science from the Massachusetts Institute of Technology and an MBA from the MIT Sloan School of Management.

### Defendant Capel

26.     Defendant Capel has served as a Company director since January 1, 2026.

Defendant Capel also serves as a member of Remuneration and Nomination Committee.

27.     The leadership page of the Company's website[3] states the following about

Defendant Capel:

Patricia Capel joined the Board in January 2026. Ms. Capel is currently a Senior Partner, Global Head of Human Capital at JAB Holding Company. Ms. Capel joined JAB in 2021, following 25 years at AB InBev and Ambev, after previously working for PwC and Cargill Agricola S.A. She is an accomplished business leader with extensive global experience in the United States, Europe, Latin America, and Canada. She held various positions in Finance, People (HR), M&A Integration, and Commercial operations.

Ms. Capel, a Senior Partner at JAB, leads the People agenda for JAB and serves on the Board of Directors of JAB's portfolio companies, playing a key role in driving JAB's long-term value creation strategy and operational excellence across the firm.

### Defendant Creus

28.     Defendant Creus has served as a Company director since 2022.

---

[3] https://investors.coty.com/corporate-governance/board-of-directors/default.aspx

29.     The 2025 Proxy Statement states the following about Defendant Creus:

**Joachim Creus** joined the Board in 2019. Mr. Creus has served as Chairman and Co-CEO of JAB Holding Company S.à r.l. ("JAB Sarl") since May 2025 and has served as a Managing Partner since March 2021. Mr. Creus served as Vice Chairman at JAB Sarl from March 2021 to May 2025. In January 2024, he was appointed as CEO of JAB Sarl. He previously served as Partner, General Counsel and Head of Tax at JAB Sarl. Mr. Creus has held various executive officer roles at several JAB Group entities from time to time. Prior to joining JAB Sarl, he served as a Tax Director at Siemens from 2007 and held other legal- and tax-related positions at Rödl & Partner and Tiberghien Lawyers. He is also a director of JDE Peets N.V., which is publicly listed outside the United States. He served as a director of Keurig Dr Pepper Inc. until February 2025. Mr. Creus holds several degrees from KU Leuven and an LL.M. in International Tax Law from Vienna University of Economics and Business.

**Defendant Engelen**

30.     Defendant Engelen has served as a Company director since November 6, 2025.

31.     The 2025 Proxy Statement states the following about Defendant Engelen:

**Frank Engelen** is a new nominee for director. Mr. Engelen has served as Vice Chairman and Co-CEO of JAB Sarl since May 2025 and has served as a Managing Partner since December 2023. Mr. Engelen served as CFO of JAB Sarl from December 2023 to May 2025. Mr. Engelen joined JAB Sarl as partner in 2020. Previously, he was a partner at PwC for over 15 years, serving for five years as a member of the Management Board of PwC Netherlands and as director and member of the Executive Board of PwC Europe for two years. Mr. Engelen is a non-executive director of JAB portfolio companies including JDE Peet's N.V., which is publicly listed outside the United States, Independence Pet Holdings and Pinnacle Pet Group. He served as a director of Keurig Dr Pepper Inc. from October 2024 until February 2025. Mr. Engelen holds a degree from Comenius College, a law degree from Leiden University and an LL.M. in International Tax Law from Erasmus University, Rotterdam.

Mr. Engelen brings to our Board more than 25 years of experience in managing complex tax matters and transactions, including deal structuring, financing, corporate structuring and tax planning in a variety of industries.

**Defendant Harf**

32.     Defendant Harf served as a Company director from 1996 until he resigned on December 31, 2025. Defendant Harf served as Chairman of the Board from November 2018 until he resigned December 31, 2025. Defendant Harf previously served as CEO from 1993 to 2001 and

as interim CEO from May 31, 2020 to August 31, 2020. He also previously served as Chair of the Remuneration and Nomination Committee.

33.     The 2025 Proxy Statement states the following about Defendant Harf:

**Peter Harf** joined the Board in 1996 and has served as Chairman of the Board since November 2018. Mr. Harf served as Chief Executive Officer of the Company from 1993 to 2001, as interim Chief Executive Officer from May 31, 2020 to August 31, 2020, as Chairman of the Board from 2001 to 2011 and Chair of the RNC from 2011 until December 2016. Mr. Harf recently retired as Managing Partner and Chairman of JAB Sarl, having joined in 1981, and also retired as a Managing Director of Lucresca SE and Agnaten SE, privately-owned holding companies affiliated with the JAB Group. Mr. Harf will continue to serve as Chairman of the Board and Managing Director of Alfred Landecker Foundation. Mr. Harf is also the Chairman of JDE Peet's N.V. He is co-founder and Executive Chairman of Delete Blood Cancer (DKMS). Previously, he served as Deputy Chairman of Reckitt Benckiser plc and Chairman of Anheuser-Busch InBev SA/NV, Chairman of Espresso House Holding AB and as a director of Panera Bread Company, Pret A Manger, Caribou Coffee Company/Einstein Noah, Krispy Kreme Doughnuts Inc., Keurig Dr Pepper Inc. and Compassion First. Mr. Harf holds a Master of Business Administration degree from Harvard Business School and a Diploma and a Doctorate in Economics from the University of Cologne in Germany.

**Defendant Makanju**

34.     Defendant Makanju served as a Company director from December 2020 until March 18, 2026. Defendant Makanju also served as a member of the Audit and Finance Committee (the "Audit Committee").

35.     The 2025 Proxy Statement states the following about Defendant Makanju:

**Anna Adeola Makanju** joined the Board in December 2020. Ms. Makanju is a renowned expert in global policy who brings over 15 years of experience across U.S. government and leading private sector companies. Ms. Makanju currently serves as VP of Global Affairs at OpenAI, a leading AI research and deployment company, leading OpenAI's work with policymakers around the world to advance its mission to ensure that artificial intelligence benefits humanity. From 2018 to 2021, Ms. Makanju served in senior policy positions at Facebook, including as Global Policy Manager for content regulation. Ms. Makanju served as a Special Adviser for Europe and Eurasia to then-Vice President, now President Joseph R. Biden, focusing on policy and engagement strategies with 51 countries, including Russia and Turkey. She has also served as a Senior Adviser to the U.S. Ambassador to the United Nations and as Director for Russia on the U.S. National Security Council. As an attorney, Ms. Makanju practiced international law at Cleary Gottlieb

Steen & Hamilton LLP and international criminal tribunals in the Hague. Ms. Makanju served as a director of Panera Brands Inc. until May 2025. Ms. Makanju received her B.A. from Western Washington University and holds a J.D. with Pro Bono Distinction from Stanford Law School.

**Defendant Parize**

36.    Defendant Parize served as a Company director from February 2020 to March 18, 2026. Defendant Parize also served as a member of the Audit Committee.

37.    The 2025 Proxy Statement states the following about Defendant Parize:

**Isabelle Parize** joined the Board in February 2020. Since March 2025, Ms. Parize has returned to her role of CEO of DELSEY, SA, a luggage and travel accessories company. Ms. Parize has served as Chief Executive Officer and Chairman of the Board of Directors of DELSEY, SA since September 2018, having served as Chief Executive Officer at DELSEY Paris from November 2018 to July 2021 and then Chairman from July 2021 to March 2025. Prior to that, she was Chief Executive Officer of Douglas Holding SA, a German fragrance and cosmetics retail company, from 2016 until March 2018 and Chief Executive Officer at Nocibe, a French fragrance and cosmetics retail company, from 2011 to 2016. Ms. Parize is also the Chairman of the board, member of the remuneration committee, and president of the strategic committee of Carbios, a green biotechnology company focused on plastic recycling, which is publicly listed outside the United States. From 2020 to 2024, Ms. Parize served as a director of FLO Health Inc., a private company that provides mobile application services for women's health. Ms. Parize previously served as a director and member of the audit committee of Air France-KLM S.A. from 2014 to 2023 and Pandora Group, a Danish jewelry company from 2019 to 2021. Ms. Parize is an MBA graduate from Ecole Superieure de Commerce de Paris.

**Defendant Singer**

38.    Defendant Singer has served as a Company director since 2010. He also serves as a member of the Remuneration and Nomination Committee and the Audit Committee.

39.    The 2025 Proxy Statement states the following about Defendant Singer:

 **Robert Singer** joined the Board in 2010, and has served as Chair of the Audit and Finance Committee since 2017. From May 31, 2020 to June 13, 2023, he served as Lead Independent Director. From 2006 to 2009 he served as Chief Executive Officer of Barilla Holding S.p.A., an Italian food company, and before that, he served as the President and Chief Operating Officer of Abercrombie and Fitch Co. from 2004 to 2005. He served as Chief Financial Officer of Gucci Group N.V. from 1995 to 2004. Mr. Singer started his career at Coopers & Lybrand in 1977. Mr.

11

Singer has served as a director and chair of the audit committees of Swarovksi International Holding AG since 2021 and Keurig Dr Pepper Inc. since July 2018. He served as a director of Panera Brands from September 2017 to 2025 and as its audit committee chair from 2017 to November 2024, and has provided similar services to certain private companies affiliated with JAB Group. From 2019 to 2022, Mr. Singer served as a member of the board of the private fashion company, Acne Studios, and continues to provide consulting services to the company.

Mr. Singer has served as an advisor to the private equity firm IDG Capital, a private equity firm, since November 2018, and served as a senior advisor to CCMP Capital Advisors, LLC from 2011 to January 2016. Mr. Singer also served as a director and Chairman of the audit committee of Jimmy Choo PLC from September 2014 to 2017 and Tiffany & Co. from 2012 to 2021, and as a director of Gianni Versace S.p.A. from 2009 to December 2016 and of Mead Johnson Nutrition from 2009 to June 2017. He received a Bachelor of Arts Humanities degree from Johns Hopkins University, a Master of Arts degree in Comparative Literature from University of California, Irvine and graduated from New York University with a Master of Science in Accounting.

Mr. Singer brings to our Board many years of operating, financial and executive experience, including in the fashion industry. Mr. Singer has significant public company board and audit committee experience and extensive risk management experience.

**Defendant Strobel**

40.      Defendant Strobel has served as a Company director since January 1, 2026. Defendant Strobel has also served as Executive Chairman of the Board and Interim CEO since January 1, 2026.

41.      The leadership page of the Company's website states the following about Defendant Strobel:

Markus is a highly accomplished global consumer and beauty executive. Prior to joining Coty, he spent 33 years at Procter & Gamble, where he most recently served as President of P&G's Global Skin & Personal Care business, including a multi-billion-dollar portfolio of more than 12 global brands. During his tenure, he led category and organizational transformation across beauty and grooming, including revitalizing SK-II into a leading prestige skincare brand in Asia. Markus holds an MBA in Marketing & Finance from Indiana University's Kelley School of Business.

**Defendant von Bretten**

42.     Defendant von Bretten served as a Company director from April 2024 until he stepped down from the board on March 18, 2026. Defendant von Bretten previously served as the Company's Chief Transformation Officer from June 2020 until March 31, 2024.

43.     The 2025 Proxy Statement states the following about Defendant Bretten:

**Gordon von Bretten** joined the Board in April 2024 and currently is a Senior Partner of JAB. From June 2020 to March 31, 2024, Mr. von Bretten served as Chief Transformation Officer of the Company. Prior to joining the Company, from 2015 to 2020, he served as an operating partner at KKR Capstone, a team of operating professionals at KKR, focusing on corporate carve-outs and procurement and supply chain value creation across the KKR private equity portfolio. He also previously served in a variety of leadership roles in industry and management consulting, including with Klöckner Pentaplast, Alix Partners, and A.T. Kearney, specializing in restructuring and performance improvement. Mr. von Bretten has served as a director of Krispy Kreme, Inc. since June 2025. Mr. von Bretten holds a Bachelor degree in International Business from IBS, Lippstadt (Germany) and an M.B.A. from Wilfrid Laurier University in Waterloo (Canada).

Mr. von Bretten brings to the Board more than 30 years of experience in leading strategic initiatives, creating value and performance enhancement. As our former Chief Transformation Officer, Mr. von Bretten has close knowledge of our transformation agenda and current challenges in the beauty industry.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

44.     By reason of their positions as officers, directors, and/or fiduciaries of Coty and because of their ability to control the business and corporate affairs of Coty, the Individual Defendants owed Coty and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Coty in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Coty and its shareholders so as to benefit all shareholders equally.

45.     Each director and officer of the Company owes to Coty and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

46.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Coty, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

47.     To discharge their duties, the officers and directors of Coty were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

48.     Each Individual Defendant, by virtue of their position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Coty, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised a majority of Coty's Board at all relevant times.

49.     As senior executive officers and/or directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NYSE, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false

14

information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information. Further, they had a duty to ensure the Company remained in compliance with all applicable laws.

50. To discharge their duties, the officers and directors of Coty were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Coty were required to, among other things:

(a) ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, New York, and the United States, and pursuant to Coty's own Code of Business Conduct (the "Code of Conduct");

(b) conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c) remain informed as to how Coty conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d) establish and maintain systematic and accurate records and reports of the business and internal affairs of Coty and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e) maintain and implement an adequate and functioning system of internal legal,

financial, and management controls, such that Coty's operations would comply with all applicable laws and Coty's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)      exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)      refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)      examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

51.      Each of the Individual Defendants further owed to Coty and the shareholders the duty of loyalty requiring that each favor Coty's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

52.      At all times relevant hereto, the Individual Defendants were the agents of each other and of Coty and were at all times acting within the course and scope of such agency.

53.      Because of their advisory, executive, managerial, directorial, and controlling positions with Coty, each of the Individual Defendants had access to adverse, nonpublic information about the Company.

54.      The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of

herein, as well as the contents of the various public statements issued by Coty.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

55.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

56.    The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects, and internal controls; and (iii) artificially inflate the Company's stock price.

57.    The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of Coty was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

58.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

59.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Coty and was at all times acting within the course and scope of such agency.

## COTY'S CODE OF CONDUCT

60.     Coty's Code of Conduct states that "The policies outlined in our Code of Conduct must be respected, understood and followed by everyone who acts on behalf of Coty. This includes all employees, directors, legal representatives, ambassadors and contractors of Coty, Coty subsidiaries and joint venture companies, regardless of their position, location or function."

61.     The Code of Conduct states that its purpose is as follows:

The Code of Conduct describes how Coty expects you to behave when facing specific situations which we all may face from time to time. When an issue is not directly addressed, you should use the Code of Conduct as a roadmap for making ethical decisions.  The Code of Conduct is the base for all other Coty policies when discussing the behaviors expected of our employees and associated business partners.

As an expression of our corporate values, all business must be conducted in accordance with the Code of Conduct and in compliance with all related policies, applicable laws, rules, and regulations.  Our Code of Conduct applies to all employees, directors, legal representatives, ambassadors, contractors of Coty, Coty subsidiaries and joint venture companies, regardless of their position, location or function.

62.     In the section "Applicability of the Code of Conduct," the Code of Conduct states

18

the following:

> The Compliance Team, together with the Audit and Finance Committee of the Board of Directors, are responsible for overseeing the interpretation and enforcement of the Code of Conduct.
>
> Only the Audit and Finance Committee, the Chief Legal Officer and the Global Compliance Officer may, in their sole discretion and based on results of internal investigations, waive provisions of this Code of Conduct. All waivers or changes to this Code of Conduct must be publicly disclosed (to the extent required) in a manner that complies with the requirements of the SEC, the listing standards of the New York Stock Exchange, Euronext Paris, and any other applicable regulations.
>
> Only the Audit and Finance Committee, the Chief Legal Officer and the Global Compliance Officer may, in their sole discretion and based on results of internal investigations, waive provisions of this Code of Conduct. All waivers or changes to this Code of Conduct must be publicly disclosed (to the extent required) in a manner that complies with the requirements of the SEC, the listing standards of the New York Stock Exchange, Euronext Paris, and any other applicable regulations.

63.    In the section "Compliance with Laws, Regulations & Company Policies," the Code of Conduct states the following, in relevant part:

> Behavior that violates the Code of Conduct may also violate local laws, subjecting those personnel involved to prosecution, fines, and in some cases, imprisonment. Coty business shall always be conducted in compliance with all applicable internal policies, laws, rules, and regulations - for every country where it has operations. It is the responsibility of every Coty representative (including, but not limited to, employees or contractors) to comply with all applicable laws and governmental regulations at any level in the states and countries in which Coty operates. Failure to obey these rules constitutes, among other possible violations, a breach of our Code of Conduct.  Any suspected illegal action will be promptly addressed and investigated, which may result in reports to the appropriate authorities and/or eventual disciplinary actions, including termination of employment.

64.    Under the heading "Managing Allegations of Misconduct" the Code of Conduct states:

> Coty takes allegations of misconduct very seriously and is committed to taking any, and all, appropriate disciplinary actions based on the type and severity of the allegations raised. The decision to initiate an internal investigation may be a matter of policy, regulation, or left to the discretion of the Compliance function. Not every case that raises the possibility of a violation merits a full internal investigation and a short or limited inquiry or pre-inquiry may be sufficient to determine facts and

19

provide a basis for response. Coty may also decide to initiate a formal investigation involving employees, leaders or third parties to ensure its compliance with the Global Policy for Managing Allegations of Misconduct.  In any case, all internal investigations are governed by the following golden rules and apply to all investigation procedures.

65.      Under the heading "Conflicts of Interest," the Code of Conduct states the following:

A conflict of interest is any circumstance that could cast doubt on an employee's ability to act appropriately regarding Coty's best interest or any situation that benefits the individual to the detriment of Coty. While we cannot list every circumstance that constitutes a conflict of interest, as they might appear in different scenarios, there are some common situations that most certainly can result in a conflict of interest:

• Having an undisclosed, substantial personal relationship with another employee, supplier, competitor or customer.

• Having an undisclosed, substantial financial interest in a supplier, competitor or customer.

• Having an undisclosed interest in a transaction in which Coty is, or may be, interested.

• Taking advantage of other corporate opportunities for personal benefit.

• Receiving undisclosed fees, commissions, excessive gifts or gratuities, or other compensation from a Coty supplier, competitor or customer; or

• Having outside business or other interests that have a negative impact on your motivation or performance.

Before taking any action which could possibly constitute a conflict of interest, and to avoid potentially damaging effects both on you and Coty, you must make prompt disclosure to your Manager, Human Resources, your local Compliance Officer, the Global Compliance Officer or the Coty Hotline of any fact or circumstance that may involve a conflict of interest or the appearance of a conflict of interest. This disclosure can assist in resolving doubts as to whether an activity is permissible or not. If permissible, mitigants will be put in place by the Compliance team.

Even with the best of intentions, the mere appearance of a conflict of interest can be as damaging as an actual conflict, and you should avoid any activities that create the appearance of a conflict of interest. A good general rule is to avoid any action or association that could be embarrassing to you or Coty if it were disclosed to the

public.

66.     Under the heading "Disclosures, Use & Recording of Corporate Funds," the Code

of Conduct states the following:

> Employees who are responsible for making Coty's periodic reports and other disclosures or who come into contact with financial information concerning Coty have a duty to do so in such a manner that all entries in Coty's records give an accurate picture of the results of our operations and our financial position.

> Coty discloses information to the public on a regular basis. Employees responsible for making Coty's periodic reports and other documents filed with the Securities and Exchange Commission (the "SEC"), or otherwise disclosed publicly, including all financial statements and other financial information, are responsible for preparing these disclosures in compliance with applicable securities laws and rules. Coty's SEC filings and other public communications should contain full, fair, accurate, timely and understandable disclosures.

> Coty business records must be prepared accurately, conscientiously and in reasonable detail. They must reflect all transactions involving Coty and all other events that are the subject of a specific regulatory record-keeping requirement. All transactions must be executed in accordance with Coty's general or specific authorization and comply with generally accepted accounting principles.

> You should not use Coty funds or assets for any unlawful purpose, and you are strictly prohibited from engaging, executing or facilitating in any money laundering activity.  You are required to be vigilant and exercise good judgment in all of your activities involving Coty funds or assets, including customer transactions. You are expected to protect Coty's financial against misuse, loss, fraud or theft, and only authorizing commitments, expenditures, borrowing or other financial transactions that are in line with your role. In keeping with this policy, no Coty employee or anyone acting directly or indirectly on behalf of Coty may:

> • Establish or maintain an unrecorded fund or asset;

> • Make false or artificial entries in the books or records; or

> • Approve or make any payment with the intention or understanding that all or part of the payment will be used for a purpose other than the purpose that is described in the documents supporting the payment.

67.     In the section "Insider Information," the Code of Conduct states:

> Coty employees and contractors who are aware of material information regarding Coty or another public company that has not been disclosed to the public (i.e., facts

which may affect the market price for that company's securities and investors' decisions to trade therein) must hold that information in strict confidence, and refrain from buying or selling, or influencing the decisions of others to buy or sell, the securities of any such company until such information has been publicly disclosed and enough time has elapsed to allow investors to react to the information. "Tipping" is also a violation of our Code of Conduct, and you may be held liable for violating insider trading laws if you tip.  Tipping occurs when you provide material, non-public information about a company to anyone else, including family members or friends, who then use that information to trade in a company's securities.

68.     In violation of the Code of Conduct, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, and violations of the Exchange Act. Also, in violation of the Code of Conduct, the Individual Defendants failed to maintain internal controls, failed to obtain waivers and/or failed to disclose obtained waivers of violating the Code of Conduct, and failed to comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Code of Conduct.

## COTY'S AUDIT COMMITTEE CHARTER

69.     The Company also maintains an Audit and Finance Committee Charter (the "Audit Committee Charter"). According to the Audit Committee Charter, the purpose of the Audit Committee is as follows:

The Audit and Finance Committee (the "Committee") is appointed by the Board of Directors (the "Board") of Coty Inc. (the "Company") to assist the Board in oversight of:

• the integrity of the Company's financial reporting process, sustainability reporting process, and systems of internal controls, including the integrity of the Company's financial statements;

• compliance with the Company's Code of Business Conduct and laws and

22

regulations; and

• the independence, qualifications and performance of the Company's independent auditors and internal audit department, and, as applicable, the external audit firm providing assurance on sustainability reports in compliance with applicable laws and regulations (the "Sustainability Auditor").

The Committee shall maintain free and open communication with the independent auditors, the internal auditors, the Sustainability Auditor, Company management and the Board. In discharging its oversight role, the Committee is empowered to investigate any matter relating to the Company's accounting, auditing, internal control, financial reporting practices or sustainability reporting practices brought to its attention, with full access to all Company books, records, facilities and personnel.

70.    In a section titled "Duties and Responsibilities," the Audit Committee Charter

states the following, in relevant part:

4. **Audit and Non-Audit Services.** Review and pre-approve both audit and non-audit services to be provided by the independent auditors, and establish policies and procedures for the pre-approval of audit and non-audit services to be provided by the independent auditors.

5. **Audit Committee Report**. Oversee the preparation of the audit committee report required by the rules of the SEC to be included in the Company's annual proxy statement.

\* \* \*

7. **Financial Statements.** Meet to review the annual audited financial statements and quarterly financial statements and discuss them with management and the independent auditors, including reviewing the Company's specific disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations." These discussions shall include the matters required to be discussed under applicable rules of the Public Company Accounting Oversight Board, and other such inquiries as the Committee or the independent auditors shall deem appropriate, including discussion of critical audit matters ("CAM") and related CAM disclosures with the independent auditors. Based on such review and discussion, the Committee shall make its recommendation to the Board as to the approval of the Company's audited financial statements and whether the financial statements should be included in the annual report on Form 10-K.

The financial statement review will include, as needed, a review of analyses prepared by management setting forth significant issues and judgments made in connection with the preparation of the financial statements, including analyses of

the effects of alternative GAAP methods on the financial statements, and a review of the effect of regulatory and accounting initiatives, as well as off-balance sheet structures, on the financial statements of the Company.

8**. Earnings Releases.**  Review and discuss earnings press releases, and corporate practices with respect to earnings press releases and financial information and earnings guidance provided to analysts and ratings agencies.

9. **Plan and Results of Audit.**  Discuss with the auditors the nature and rigor of the audit process, receive and review audit reports, receive the recommendation of management as to the fee to be paid to the independent auditors, and provide the auditors full access to the Committee (and the Board) to report on any and all appropriate matters.   The Committee also shall review and discuss with the independent auditors the results of the annual audit and any audit problems or difficulties and management's response.

10. **Sustainability Reporting and Assurance.**  The Committee shall have the following responsibilities related to sustainability reports required by applicable reporting regulations:

> (a)   monitor the sustainability reporting process, including the process implemented to comply with applicable sustainability reporting regulations;

> (b)  monitor the effectiveness of the internal controls and disclosure controls related to sustainability reporting;

> (c) oversee the procedure for selecting the Sustainability Auditor and at least annually consider the independence of the Sustainability Auditor;

> (d) monitor the assurance of the sustainability report and evaluate the performance of the Sustainability Auditor;

> (e)  meet to review the annual consolidated sustainability report and discuss it with management and the Sustainability Auditor;

> (f)   report to the Board on the results of the assurance of the sustainability report, the assurance process and matters relating to the integrity of sustainability information.

11. **Internal Audit.**  Oversee internal audit activities, including discussing with management and the internal auditors the internal audit function's organization, objectivity, responsibilities, plans, results, budget and staffing.  This includes (a) a review of regular internal reports to management (or summaries thereof) prepared by the internal audit function, as well as management's response; (b) reviewing and advising on the selection and removal of the internal audit director; and (c) an annual review of recommended changes (if any) to the internal audit charter.

12. **Disclosure Controls and Procedures.** Periodically review with management the adequacy and effectiveness of the Company's disclosure controls and procedures.

13. **Internal Controls**. Discuss with management, the internal auditors and the independent auditors the quality and adequacy of and compliance with the Company's internal controls, including any material weaknesses or significant deficiencies and significant changes in internal controls. Areas of discussion to include (a) the reliability of financial reporting; (b) the compliance with applicable codes, policies, laws, and regulations; and (c) the preservation of the Company's assets. The review will include any significant matters and regulatory concerns, including any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal control over financial reporting. The Committee also will review internal audit plans in significant compliance areas.

14. **Financial Condition**. Review periodically the Company's financial condition and financing plans, including debt covenant compliance, capital spending requests, proposed 4 significant borrowings, sources and uses of cash, and potential acquisitions and divestitures.

15. **Financial Policies.** Review and recommend to the Board for adoption key financial policies such as capitalization, dividend, foreign exchange and investment of funds.

16. **Accounting Principles and Disclosure.** Review significant developments in accounting rules. The Committee will review with management recommended changes in the Company's accounting or financial statements and with the independent auditors any significant proposed changes in accounting principles and financial statements.

17. **Related Person Transactions.** Establish policies and procedures for the review, approval and ratification of related person transactions, as defined in applicable SEC rules, review or ratify, as applicable, related person transactions, and oversee other related party transactions governed by the accounting rules.

18. **Legal Matters.** At least annually, discuss with management and/or the Company's General Counsel any legal matters (including the status of pending litigation) that may have a material impact on the Company's financial statements, and any material reports or inquiries from regulatory or governmental agencies.

19. **Ethical Environment.** Consult with management on the establishment and maintenance of an environment that promotes lawful and ethical behavior, particularly the establishment, communication, and enforcement of a Global Compliance Program that prevents and detects criminal conduct and promotes a

25

culture that encourages ethical conduct and a commitment to compliance with the law.

20. **Procedures for Complaints.**  Establish and oversee procedures for the receipt, retention, and investigation of alleged violations of law and/or company policy, including the Code of Conduct, Global Policies and Procedures, the Coty Finance Manual, and other accounting, auditing, or federal securities law matters or internal accounting controls. Such procedures shall include reporting mechanisms that enable safe, confidential and anonymous reports and protection against retaliation for raising concerns, including regarding questionable accounting, auditing or federal securities law matters.

21. **Compliance Program**.  At least annually, review the Company's Global Compliance Program and management's system to monitor compliance with the overall program. Meet, at least annually, to review the implementation and effectiveness of the Company's compliance program with the General Auditor, General Counsel and SVP – Global Compliance, each of whom shall have the authority to communicate directly to the Committee, promptly, about actual and alleged violations of law or Company policy, including any matters involving criminal or potential criminal conduct.  Review on a quarterly basis a report from the General Auditor, General Counsel and SVP – Global Compliance regarding the status of any reports of misconduct.

22. **Oversight of Executive Officers and Directors and Conflicts of Interest.**  At least annually, review the Company's policy with respect to conflicts of interest and compliance with the policy.  The Committee will review compliance with Company policies and 5 procedures with respect to officers' expense accounts and perquisites, including their use of corporate assets, and consider the results of any review of these areas by the internal or independent auditors.  The Committee will review significant questionable payments, if any.

23. Risk Management. Review and discuss the Company's practices with respect to risk assessment and risk management, and oversee and evaluate the Company's risk management policies in light of the Company's business strategy, capital strength, and overall risk tolerance. The Committee also will evaluate on a periodic basis the Company's investment and derivatives risk management policies, including the internal system to review operational risks, procedures for derivatives investment and trading, and safeguards to ensure compliance with procedures. The Committee also will evaluate on a periodic basis the Company's cybersecurity and privacy programs and receive information on cybersecurity and privacy compliance as needed.

\* \* \*

25. **Finance Function.**   Review, with management, the Company's finance function, including its budget, organization and quality of personnel.  Review with

26

the independent auditors, the internal audit function, and management the extent to which changes or improvements in financial or accounting practices have been implemented.

71.     In violation of the Audit Committee Charter, the Individual Defendants (as key officers and members of the Company's Board) conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, gross mismanagement, abuse of control, waste of corporate assets, and violations of the Exchange Act. Moreover, in violation of the Audit Committee Charter, the Individual Defendants failed to maintain the accuracy of the Company's records and reports, comply with laws and regulations, act in good faith and diligence without misstating, misrepresenting, or omitting material facts, and properly report violations of the Audit Committee Charter.

## THE INDIVIDUAL DEFENDANTS' MISCONDUCT

### *Background*

72.     Coty is a Delaware Corporation headquartered in New York, New York, chiefly engaged in the beauty industry. The Company was founded in 1904 and has since become among the world's largest beauty companies. As such, the Company offers various products including fragrances, color cosmetics, and skin and body care.

73.     Coty operates through two segments: the Prestige Beauty Segment and Consumer Beauty Segment. The Prestige Beauty Segment encompasses so-called "prestige" or luxury products and includes brands such as Burberry, Calvin Klein, Gucci, Hugo Boss, and numerous others.

74.     The Company sells its Prestige Beauty products through retailers, namely perfumeries, e-retailers, direct-to-consumer websites, duty-free shops, and department stores.

75.    The Consumer Beauty Segment consists of products intended for a wider swath of consumers, and includes brands such as Adidas, Vera Wang, and David Beckham. Consumer Beauty products are sold through the following media: dedicated e-commerce retailers, hypermarkets, supermarkets, drug stores and pharmacies, mid-tier department stores, as well as traditional food and drug retailers.

**False and Misleading Statements**

***August 20, 2025 4Q'25 Press Release***

76.    On August 20, 2025, the Company issued a press release in connection with the fourth quarter and year-end results for Fiscal Year 2025 (the "4Q'25 Press Release"). The 4Q'25 Press Release quoted Defendant Nabi as highlighting what investors should expect from the coming Fiscal Year 2026, stating, in relevant part:

> We are returning to our cadence of blockbuster launches, with the early results on our recently-launched Boss Bottled Beyond already exceeding our prior blockbuster benchmarks. At the same time, we have unleashed a major attack plan in the affordable, complementary and strongly profitable fragrance mists category, with mist launches across more than a dozen of our brands rolling out in the coming 12 months and strong initial results on our recently launched CK mists.
>
> All of this underpins our expectations for steady, sequential trend improvement in LFL sales and adjusted EBITDA through FY26, returning to growth in 2H26.

77.    Defendant Nabi was also quoted as saying the following regarding the Company's operating results and strategy, in relevant part:

> While Q4 was broadly in line with expectations as we set the baseline for a strong launch calendar in FY26, and we expect our organizational changes will start yielding results in the coming year, there is more to do. As outlined at CAGNY, we are entering the next phase of our strategy with a sharper focus on our core strengths and the most attractive categories where we can deliver outsized returns.
>
> First, we will leverage and prioritize our leadership position and best-in-class capabilities in global fragrances to fuel strong expansion – with fragrances already more than 60% of revenues and an even bigger portion of our profits. Second, we will continue to grow Coty's footprint and diversification in a limited number of structurally profitable and growing beauty categories and geographic markets at

28

scale.

We believe fragrances will remain a structurally advantageous category, supported by beauty category-leading brand loyalty, strong consumer demand, increasing usage, broader price points and formats, and expanding global penetration.

78.    In providing the outlook for Fiscal Year 2026, the 4Q'25 Press Release stated, in

relevant part:

Consistent with its prior outlook, Coty expects a gradual improvement in sales trends over the course of FY26 from the 4Q25 LFL levels when the Company actively intervened to clean up the baseline of the business. ***Coty anticipates a LFL decline of 6% to 8% in 1Q26 and a LFL decline of 3% to 5% in 2Q26, with a return to LFL growth in 2H FY26***. These expected gradual improvements in sales trends in both Prestige and Consumer Beauty are underpinned by multiple levers, including several major launches in both divisions, and geographic and channel expansion, coupled with easier comparisons in the second half of the year.

***August 20, 2025 Earnings Call***

79.    That same day, the Company shared prepared remarks from its earnings call for

the fourth quarter and year-end of Fiscal Year 2025 (the "4Q'25 Earnings Call").

80.    During the 4Q'25 Earnings Call, Defendant Mercier stated the following regarding

expectations for Fiscal Year 2026:

As we look ahead to FY26, consistent with what we discussed last quarter, we expect sequential improvement in sales and profit trends compared to what we reported in Q4. ***We expect the organizational changes we are implementing in the U.S. to begin yielding results and building over the course of the year.*** Therefore, we anticipate net revenues to remain negative in the first half as strong contribution from innovation, new sub-categories and support from distribution gains, are offset by headwinds from a trade inventory reduction, more promotional environment and elevated year-over-year comparisons. ***Importantly, we anticipate net revenues will turn positive in the second half, with further new launches and as year-over-year comparisons ease.*** The combination of lower sales, a net negative impact from tariffs, and the anticipated restoration of variable compensation, will weigh on EBITDA in the first half. ***However, we expect EBITDA to be positive in the second half of FY26 supported by a return to sales growth and stepped up contribution from our tariff mitigation plans.***

Let me share some more concrete guidance for the first half of the year. Consistent with our prior outlook, we expect a gradual improvement in sales trends over the

29

course of FY26 from the 4Q25 LFL levels. ***We anticipate a LFL decline of 6% to 8% in 1Q26 and a LFL decline of 3% to 5% in 2Q26, with sequential improvement in LFL trends in both Prestige and Consumer Beauty***. On the reported revenue side, we estimate a low single digit FX benefit in the first half.

* * *

Now, turning to the second half expectations. We expect our LFL sales to return to growth in the second half supported by both divisions, including several major launches in both divisions, as well as more favorable comparisons. We also expect to return to adjusted EBITDA growth in the second half, which will fuel adjusted EPS growth. Our goal is also to continue on our deleveraging path in CY26, as we target reaching an investment grade profile.

81.    Defendant Nabi then spoke about how the Company was attempting to transform

Consumer Beauty, stating, in relevant part:

We are acting with urgency to return Coty to consistent and profitable growth. Let me share more on the actions we are taking to return to outperformance in the medium to long term. ***This spring, we announced a new regional structure to make Coty nimbler and more aligned with today's evolving channel landscape. We also appointed new leadership in the U.S. and that team is already beginning to make key changes. The U.S. is now benefiting from a seasoned leadership team and an overarching regional structure that adds another layer of experience and agility***. We've also adjusted our bonus structure to better incentivize regional performance. Early green shoots are promising, as in the U.S. prestige fragrance market our sell-out gap has narrowed from 11% in Q1 to 5% in Q4, and we're even more encouraged to see that in July our U.S. prestige fragrance sell-out grew by a double digit percentage and 1.5 times the market growth.

* * *

We also elevated our Chief Information Officer, now serving as Chief Information, Digital Innovation, and Business Services Officer, through internal promotion. This role is central to accelerating AI implementation across Coty. We have made early strides, with AI already deployed across key functions including marketing, digital, supply chain, procurement, and finance.

AI is already embedded into Coty's core processes, not as a future ambition, but as a present-day reality. In Supply Chain, we use AI for demand planning and have deployed a price chatbot in procurement to drive smarter, faster decisions***. In Marketing, AI powers media allocation models and supports content creation and optimization, including SEO copy generation and translation, to improve efficiency and reach***. And across back-end functions, over 60 robotics process automation bots automate tasks like accounts payable and IT help desk support.

Combined with last year's SAP S4HANA implementation excluding Brazil, these tools are already improving speed, accuracy, and ROI, and we're just getting started.

\* \* \*

As we look ahead, our focus is clear: re-establishing a healthy baseline for growth. In fact, we are targeting steady, sequential improvement in LFL sales and EBITDA trends throughout FY26, returning to growth in the second half. We're building on our already strong foundations to return to multi-year growth, including: A return to blockbuster fragrance launches, already underway in Q1; Leveraging our unique position as the only global beauty player with a fragrance portfolio across the full price spectrum; A robust attack plan for the rapidly growing fragrance mists subcategory; A sharpened focus on step-changing profitability in our cosmetics business; And the continued execution of our All-In to Win transformation program to protect profit and investment behind our brands. With these levers all in place, Coty is well-positioned to return to multi-year growth and long-term value creation.

### August 21, 2025 4Q'25 Earnings Call Q&A

82. On August 21, 2025, before the markets opened, the Company conducted the Question-and-Answer portion of its earnings call for the fourth quarter and year-end of Fiscal Year 2025 (the "4Q'25 Q&A").

83. During the 4Q'25 Q&A, Defendants Nabi and Mercier answered a number of questions from analysts pertaining to, *inter alia*, the Company's expected growth. Specifically, Defendant Mercier had the following exchange with one analyst, in relevant part:

<Q: Olivia Tong Cheang – Raymond James & Associates > Hey, thanks. Good morning. So, clearly, there's a lot going on with respect to the macros as well as the category. And you gave a pretty detailed guide for Q1 and Q2 on sales, EBITDA and EPS, but kept it pretty open ended for the second half. So wanted to understand a little bit about, if you could provide a little bit more detail on the second half, what initiatives still in place, what hit versus just the easing comps. Your thought process around the magnitude of improvement in the second half versus the first half and the key drivers of that. Thank you.

<A: Defendant Mercier> Yeah, absolutely. Thank you. Thank you, Olivia, for your questions. ***So indeed, I think it's very important indeed that we give you very clear indication for Q1 and Q2, and we have this visibility and we shared very precise guidance***. And indeed, as we highlighted, we are seeing that we are still in a phase of retailers' inventory reduction, which should last till the end of calendar year 2025.

And that's why we are giving this sequential improvement in Q1 and Q2 despite still negative.

***So, at the same time, as we indicated, we are seeing the category, especially in Prestige fragrance, but also in mass fragrance remaining very healthy and in low to mid-single digit. And we are seeing also our sell-out performing well in the key markets.***

So now, what it means is that the plan is that we are expecting that end of calendar year 2025, this retailer inventory headwind will end. And then we are entering calendar year 2026 or H2 fiscal 2026 in a very healthy manner where our sell-in will coincide with our sell-out. And this is supported indeed by the market, the healthy market. And our sell-out is supported also by very strong innovations that we just shared during the presentation and which will be at full speed in the H2. So this is really the algorithm.

Now, indeed, we didn't give more precise numbers on H2, because, as you say, there is high volatility. I mean, there are a lot of macro movements. ***But for sure, I mean, I can tell you with high level of confidence that indeed our H2 will be back to growth once indeed we are going through this H1***. So that's really the reasoning and really the logic on the top line.

### September 30, 2025 Revised Proxy Statement

84.     On September 26, 2025, the Company filed its annual proxy statement with the SEC. A revised proxy statement was filed with the SEC on September 30, 2025. Defendants Nabi, Ballini, Creus, Engelen, Harf, Makanju, Parize, Singer, and von Bretten solicited the 2025 Proxy Statement pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.

85.     The 2025 Proxy Statement called for the Company's shareholders to vote to, *inter alia*: (1) re-elect Defendants Nabi, Ballini, Creus, Engelen, Harf, Makanju, Parize, Singer, and von Bretten to the Board; (2) approve, on an advisory basis, the compensation for the Company's executive officers; and (3) ratify the appointment of Deloitte & Touche LLP ("Deloitte") to serve as the Company's independent registered accounting firm for Fiscal Year 2026.

86.     Regarding the "Board's Role in Risk Oversight," the 2025 Proxy Statement stated:

Our Board oversees, with management, the various risks we face. Our Board and management consider risks in all facets of the Company, our business strategy and our overall business.

Our Board dedicates a portion of one meeting each year to evaluating and discussing risk, risk mitigation strategies and the Company's internal control environment. At this meeting, our Board considers an enterprise risk management analysis. Topics examined in the enterprise risk management analysis include, but are not limited to, strategic, operational, financial and compliance risks, as well as risks related to artificial intelligence, sustainability, and ESG topics. Our Board's risk oversight also includes a comprehensive annual review of our strategic plan. Because overseeing risk is an ongoing process and inherent in our strategic decisions, our Board also receives input from senior management and considers risk at other times in the context of specific proposed actions.

In addition to our Board's risk oversight responsibility, the Board's committees are also charged with overseeing risks within their areas of responsibility and reviewing with the Board significant risks identified by management and management's response to those risks. The AFC is responsible for oversight of accounting, auditing and financial-related risks, as well as the Company's compliance program and its cybersecurity and data privacy programs. The RNC is responsible for overseeing the management of legal and regulatory risks as they relate to the Company's corporate governance structure and processes, as well as risks related to our employee compensation policies and practices. In fiscal year 2025, the RNC reviewed our compensation policies and practices to determine whether they encouraged excessive or inappropriate risk taking. Following such evaluation, the RNC determined that our compensation policies and practices do not encourage excessive or inappropriate risk taking that could result in a material adverse effect on us.

While our Board oversees risk, management is responsible for assessing and managing risk on a day-to-day basis. Certain departments, such as treasury, legal and internal audit, our compliance function, and individuals within other departments, focus on specific risks associated with different aspects of our business, from regulatory, environmental and financial risks to commercial and strategic risks. Senior members of management responsible for risk management report regularly to the AFC or the Board as appropriate. Our Board's oversight of our sustainability strategy and ESG topics is described below.

In addition, the Board has a dedicated Cybersecurity Special Committee, which is a committee, led by our Chief Information Officer and two members of the Board (including the Chair of the AFC) and consisting of executive members from various corporate functions, including information technology, digital operations, corporate affairs, legal, compliance, human resources and finance. Cybersecurity experts periodically present to the Board on topics related to information security, data privacy and cyber risks and mitigation strategies. At the management level, our

Global Information Security Team monitors alerts and informs relevant global senior management of all incidents and related mitigation and remediation, and escalates to the Cybersecurity Special Committee as needed. Global senior management monitors initiatives to prevent, detect, mitigate, and remediate cybersecurity risks and incidents. The Cybersecurity Special Committee is empowered to manage the Company's response to major cybersecurity incidents and enable the integration of crisis management and business continuity processes.

87.    Regarding the Company's "Principles of Corporate Governance and Code of Business Conduct," the 2025 Proxy Statement stated:

Our Board has developed corporate governance practices to help it fulfill its responsibilities to stockholders in providing general direction and oversight of management. These practices are set forth in our Principles of Corporate Governance. We also have a Code of Business Conduct (the "Code") applicable to all our employees, officers and directors, including the Chief Executive Officer ("CEO"), the Chief Financial Officer and other senior officers. These documents and any future waivers of provisions of the Code granted to any senior officer or any material amendments to the Code may be found as promptly as practicable, in the "Investors" section of our website: www.coty.com within the "Corporate Governance" subsection under the heading "Governance Documents" as may be required under applicable SEC and NYSE rules. The Principles of Corporate Governance and charters for the Audit and Finance Committee (the "AFC") and the Remuneration and Nomination Committee (the "RNC") may be found under the heading "Committees" within the "Corporate Governance" subsection. Stockholders may also contact Investor Relations at 350 Fifth Avenue, New York, New York 10118 or call (212) 389-7300 to obtain hard copies of these documents without charge.

88.    Defendants Nabi, Ballini, Creus, Engelen, Harf, Makanju, Parize, Singer, and von Bretten caused the 2025 Proxy Statement to be false and misleading by failing to disclose, *inter alia*, that: (1) the Company's business segments exhibited significant operational inefficiencies; (2) the Company's marketing efforts constricted the margins for its Consumer Beauty Segment; (3) as a result, the Consumer Beauty Segment was underperforming; (4) the Prestige Beauty Segment's growth was slowing; (5) as a result of the foregoing, the Company's assertions concerning its financial and growth prospects were incorrect; and (6) the Company failed to maintain internal controls. As a result of the foregoing, the Individual Defendants caused the

34

Company's public statements to be materially false and misleading at all relevant times.

89.    The 2025 Proxy Statement was also materially false and misleading because, despite assertions to the contrary, the Company's Code of Conduct was not followed, as evidenced by the Individual Defendants (1) making and/or causing the Company to make the numerous false and misleading statements and omissions alleged herein; and (2) failing to report violations of the Code of Conduct. Further, the 2025 Proxy Statement was materially false and misleading because, despite assertions to the contrary, the Board was not adequately performing its risk oversight functions.

90.    As a result of Defendants Nabi, Ballini, Creus, Engelen, Harf, Makanju, Parize, Singer, and von Bretten causing the 2025 Proxy Statement to be false and misleading, Company shareholders voted, inter alia, to: (1) re-elect Defendants Nabi, Ballini, Creus, Engelen, Harf, Makanju, Parize, Singer, and von Bretten to the Board, thereby allowing them to continue to breach their fiduciary duties to the Company; (2) approve, on an advisory basis, the compensation for the Company's executive officers; and (3) ratify the appointment of Deloitte to serve as the Company's independent registered accounting firm for Fiscal Year 2026.

### November 5, 2025 1Q'26 Press Release

91.    On November 5, 2025, the Company issued a press release in connection with the first quarter results for Fiscal Year 2026 (the "1Q'26 Press Release").

92.    Already over a month into the second quarter of Fiscal Year 2026, the 1Q'26 Press Release stated the Company's guidance for the second quarter, as well as Fiscal Year 2026, as follows, in relevant part:

> Consistent with its prior outlook, Coty expects a gradual improvement in sales trends over the course of FY26 from the 4Q25 LFL levels, when the Company actively intervened to clean up the baseline of the business. With strong sales delivery in the month of October, particularly in Prestige, Coty expects **Q2 LFL**

*sales to be at the more favorable end of prior guidance of a LFL decline of -3% to -5%, with sequential trend improvement in both Prestige and Consumer Beauty*. On the reported revenue side, Coty estimates a low-to-mid-single-digit percentage FX benefit in Q2. The Company continues to expect LFL sales to return to growth in 2H26, as sell-in and sell-out reach alignment, and supported by several key launches in Prestige, as well as more favorable comparisons.

*Coty continues to expect a gradual profit trend improvement, with adjusted EBITDA declining by a low-to-mid teens percentage in 2Q26, consistent with its prior guidance. The Company also expects to return to adjusted EBITDA growth in 2H26, targeting $1 billion in adjusted EBITDA in FY26.* While this outlook implies very strong year-over-year expansion in 2H26 adjusted EBITDA, this is primarily a function of prior year comparisons, with an implied low-single digit growth in 2H26 adjusted EBITDA on a 2-year basis.

\* \* \*

*The Company continues to expect seasonally strong free cash flow in 1H26 of over $350 million,* resulting in leverage at the end of CY25 approximately in line with the 4Q25 level of ~3.5x, reflecting the lower adjusted EBITDA and FX headwinds from the Euro-denominated debt. The Company remains fully focused on deleveraging over CY26 and beyond, targeting an investment grade profile, and is actively pursuing the monetization of Wella.

93.    The 1Q'26 Press Release also quoted Defendant Nabi as claiming that business was trending positively, and that expected growth in sales for the second half of Fiscal Year 2026. Specifically, Defendant Nabi stated, in relevant part:

*Coty's strategic progress is accelerating as we elevate Coty as a Prestige beauty company with an emphasis on fragrances and scenting across price points, complemented by capabilities in prestige cosmetics and skincare.* In line with our recent strategic announcements, over the coming years we will concentrate investment behind our portfolio brands with the greatest long-term potential, while also building and elevating our newly added licenses and brands.

\* \* \*

*Following recent changes, Coty's underlying business trends are already improving, in line to slightly ahead of our expectations, particularly in Prestige. In Q1, our U.S. Prestige fragrance sell-out grew by a mid-to-high single digit percentage, in line with the market, and we expect the U.S. Prestige business to return to both sales and sell-out growth in Q2.*

\* \* \*

*We see tremendous potential to accelerate this momentum, driven by a pipeline*

36

*of new brand launches and innovations, market-leading e-commerce, and globally scaled brick & mortar presence.*

\* \* \*

As a result, we expect Q2 sales to be at the more favorable end of our previous guidance, with a return to sales and profit growth in the second half of FY26.

### November 5, 2025 1Q'26 Earnings Call

94.    On November 5, 2025, the Company conducted an earnings call with investors and analysts to discuss the results for the first quarter of Fiscal Year 2026 (the "1Q'26 Earnings Call").

95.    During the 1Q'26 Earnings Call, Defendant Nabi commented on the Company's actions to transform the Consumer Beauty Segment. Defendant Nabi stated, in relevant part:

We've shown strong progress in improving our execution in U.S. Prestige with the U.S. being our #1 headwind in fiscal '25. *We are acting with urgency to transform our Consumer Beauty business while progressing with our strategic review. And we remain laser-focused on strengthening our profitability and balance sheet with our fiscal year '26 business trends steadily improving in line with our expectations.* As we solidify our position as a global prestige beauty company, with an emphasis on fragrance and scenting across price points with cosmetics and skin care capabilities, our goal remains delivering strong, consistent performance and outperforming the beauty market.

\* \* \*

One of our top priorities has been to address the challenges we face in the U.S. market, which accounted for the vast majority of our sales declines in '25. *In the spring, we announced the new regional structure to make Coty nimbler and more aligned with today's evolving channel landscape. We also appointed new leadership in the U.S., and we are now benefiting from a seasoned leadership team and an overarching regional structure that adds another layer of experience and agility.* These adjustments are yielding positive green shoots as we close the gap between our U.S. prestige fragrance sellout and the overall U.S. prestige fragrance market from an approximately 5-point gap in Q4 '25 to full alignment with the market in Q1 of fiscal '26.

96.    Defendant Nabi continued, noting the expectations for the second quarter. Defendant Nabi stated, in relevant part:

*With our solid sell-out growth in the last 2 quarters and assuming the Prestige fragrance market continues to grow at a similar pace, we expect our U.S. Prestige*

37

*sell-in to return to growth in Q2. These results demonstrate Coty's agility and commitment to returning to outperformance in our largest market.* We have taken decisive steps to fundamentally improve Coty's ROI and operational efficiency. The next phase of All-In To Win is underway, targeting significant fixed cost savings across the organization. *Our newly established performance and operational excellence office is reinforcing operational oversight focused on consistent performance tracking and improving ROI.*

\* \* \*

*As shared last quarter, we are accelerating AI implementation across Coty with a new road map to embed digital innovation throughout our operations. A few priorities include content automation with Agentic AI, smarter decisions through predictive analytics and visualization and better user experiences through chatbots, plus new AI assistance in procurement, for instance, which are transforming contracts and negotiations.* And with the rise of Agentic shopping across retail platforms, we are already developing and integrating tools to enhance the shopper experience, including selection optimization and virtual try-ons. *These initiatives are optimizing fixed cost investments across back-end functions and reducing the cost of content creation, freeing up funds for working media. We're already seeing some early benefits and expect them to ramp up over the coming years.*

97.     On the 1Q'26 Earnings Call, Defendant Mercier presented the outlook of the Company for the second half of Fiscal Year 2026, as well as "concrete" guidance for the second quarter, premised on the fact that the 1Q'26 Earnings Call was held over a month into the start of the quarter. Specifically, Defendant Mercier stated, in relevant part:

*Importantly, we anticipate net revenues will turn positive in the second half, supported by new launches, alignment between sell-in and sell-out and easing comparison.* Lower sales, a net negative impact from tariffs and the anticipated restoration of variable compensation are weighing on EBITDA in the first half. *However, we expect positive EBITDA in the second half, supported by a return to sales growth, stepped-up contribution from tariff mitigation and the full benefit of our fixed cost savings initiatives.*

*Let me share more concrete guidance for Q2. We continue to expect a gradual improvement in sales trends through fiscal year '26 from the Q4 '25 like-for-like levels.* With strong sales in October, particularly in Prestige, we expect Q2 like-for like sales to land at the more favorable end of our prior guidance of minus 3% to minus 5% like-for-like with sequential trend improvement in both Prestige and Consumer Beauty. We estimate a low to mid-single-digit ForEx benefit on our reported revenues in Q2.

38

* * *

*Turning now to our outlook for the second half. We continue to expect our like-for- like sales to return to growth in the second half as sell-in and sell-out reach alignment and supported by several key launches in Prestige as well as more favorable comparisons. We also expect to return to adjusted EBITDA growth in the second half, targeting around $1 billion in adjusted EBITDA for the year.* While this outlook implies very strong year-over-year expansion in our second half EBITDA, it is important to remind that this is off very low prior year comparisons, particularly in Q4 '25.

*On a 2-year basis, our EBITDA outlook for second half fiscal year '26 is a few percentage points higher than second half of fiscal year '24.* The expected profit growth will, in turn, fuel adjusted EPS growth in the second half. Our goal is also to continue deleveraging in calendar year '26 as we target reaching an investment-grade profile.

98.     During the question-and-answer portion of the Q2'26 Earnings Call, Defendant

Nabi had the following exchange with an analyst in discussing the expectations for the second

quarter, in relevant part:

<Q: Filippo Falorni – Citigroup Inc.> Sue, maybe can you comment a bit about the better performance that you're seeing in fiscal Q2 that is driving you to the higher end of the range? Are you seeing an acceleration in some category growth?

<A: Defendant Nabi > *So on the first question regarding the better performance that we are contemplating for Q2, which led to our increase in terms of being at the more favorable part of the guidance for Q2. I would say that it's a mix of everything, in fact, the dynamism of the fragrance market in the U.S. continues to be very strong. Again, we are talking about a market that's in the mid-single-digit growth. And what we see in Q2 in terms of market dynamics is confirming this element.* So we believe it's going to be a good holiday season. This is number one. *Number two, our innovations, specifically the BOSS Bottled Beyond launch that started at the end of the Q1, more or less, and it was exclusive to Travel Retail during this summer until the end of August.* So it all started in domestic markets around the end of September. This is such a big success that I believe it's going to translate into a stronger selling also for Q2.

* * *

*Number three, I think the dynamism is also at the entry part of the market, which is around the entry prestige brands, but moreover around the Mist.* The Mist today are representing more or less 2% of Q1 net revenues in fragrances, which is big, I have to say. We have become the #3 or #4 player in Europe, #1 in Italy, to take a few examples. Everywhere or every brand that launched its own mist is seeing a

very strong halo effect on the base business, be it Kylie, be it philosophy or Calvin Klein that are the first to go to market, and there are other brands arriving soon.

* * *

*The way we have built the mist is, number one, to make them fully additional, and this is really confirmed. It's really incremental sales for the company, attracting consumers, which are the youngest part of the Gen Z target, which are not usually buying into traditional fragrances to that level.* So this is one. And two, it's a gross margin that is in line with the one of our prestige fragrances. So there is absolutely no dilution in the way we have crafted and created this new category. So in a way, this Q2 better-than-expected outlook is driven by our ability, and I guess we are the only company doing this to play high low, while at the same time, securing the heart of our business, which are premium fragrances.

99.    In discussing what to expect from the Company in the second half of Fiscal Year 2026, Defendant Nabi had the following exchange with an analyst, in relevant part:

<Q: Oliver Chen – TD Cowen> Laurent, as we are excited about the second half here, what are your thoughts in terms of the key launches and how you'll think about categories and the comparisons as well that will give that return to that growth in the second half. Also, as you think about Consumer Beauty in Brazil, I would love your thoughts there on potential outlines and outcomes and time lines.

<A: Defendant Nabi> *So indeed, about H2, and indeed, we are confirming that we will be back to growth in the second half of this fiscal. So that's the #1 message. So what is behind this number is that indeed, the continuing momentum on the beauty category and especially of the Prestige fragrance category. So we see really consistent, resilient growth of this category.*

* * *

And indeed, all the work that the new management team is putting in place in the U.S. is really confirming that this trend is going to continue and amplify in the H2. So that's very important category and the U.S., which, as you remember, was the main issue that we had a year ago.

*Now we are really already in a good place that we are recovering very fast. So that's really the big element. It's going to be amplified by strong innovation.* So as you heard and as you saw, I mean, BOSS Beyond Bottled is off a very good start. And of course, it's going to continue and amplify. And we are coming also in the second half with an additional blockbuster. *So again, the fundamentals of this growth are here. And the last element, which I want to highlight, which is very important is that indeed, at the end of this calendar '25, we are seeing that our sell-out performance will converge with the sell-in performance. So indeed, we are seeing already this quarter and we continue next quarter that the level of*

40

*inventory with retailers is declining significantly.*

And indeed that we can really be back to really a well synchronized sell-out and selling. So these are really all the drivers, the key drivers confirming indeed having our H2 back to growth and of course, to continue on this growth trajectory. So indeed, that's really on the H2. So indeed, on Consumer Beauty or Cosmetics, again, I mean, we announced and we made very clear that indeed now is really led by Gordon Von Bretten, who, as you know, I mean, knows very well the company. I mean he was Head of Transformation a few years ago. And Gordon is really currently assessing and really reviewing the full potential of this division, working on all components. So the #1 mandate, of course, is really to rejuvenate really the P&L, I mean, the profit and the cash generation from Color Cosmetics. And I can tell you that Gordon is already full speed, really built already a strong team really to manage all these key initiatives.

*And I can tell you it's covering the full spectrum, again of the P&L, starting, of course, with top line, gross to net, gross margin, A&CP allocation and of course, the fixed cost. So it's really in motion, and we will keep you posted, of course, on the progress on this journey.*

And second, which is on Brazil. As you know, Brazil is a very -- is a profitable business. I mean, really the work done over the last years really has brought very, very good results. And indeed, I mean, conclusions on Brazil are likely to come before than on Consumer Beauty and on color cosmetic business.

100.    In discussing the Company's promotions and how they differ region by region,

Defendants Mercier and Nabi had the following exchange with an analyst, in relevant part:

<Q: Sydney A. Wagner – Jefferies LLC> Can you talk a little bit more about what you're seeing in terms of promotion and how that maybe varies by region or channel?

<A: Defendant Mercier> *So indeed, on your question about brick-and-mortar and e-commerce, just to zoom out a little, yes, of course, I mean, e-commerce is growing very fast.* And you know that now it's more than $1 billion net revenue for total Coty Link, and it's growing fast. In the Q1, we are seeing, I mean, the sellout of our e-commerce on both divisions is 5% to 6%. So indeed, we are really taking full opportunity of these channels.

\* \* \*

*So indeed, you have, I would say, I call it more a mix effect from between e-comm and brick-and-mortar. So that's a fact, but it's not material. The other element is also that it's putting pressure on the brick-and-mortar retailers. And as a result, they are also becoming more disciplined and strict on their inventory management.*

41

\* \* \*

And again, all the innovation that we are bringing, I mean, BOSS Beyond Bottled is the #2 male initiative in Europe. It's #1 in volume in Germany. And we are only at the beginning. So it's going to continue and amplify in the Q2. So you will see really the sellout in EMEA continue to increase. At the same time, same as the U.S., yes, we are still facing, and we will close by end of calendar. Indeed, from a selling standpoint, facing the retailer destocking. And for example, Douglas made public that they are focusing on inventory reduction.

<A: Defendant Nabi> Again, what we can say is that the Prestige fragrance market grew by 5% during the quarter globally. Which is a little slower than months ago, but it's ahead of many other consumer categories, including color cosmetics. *In the U.S., the market remains very strong, as I said it before, 7% of growth in the quarter. And very importantly, this is to answer your question. This includes low single-digit volume growth since the category continues to gain users and additional usage occasions.*

\* \* \*

*Coty has posted 15% sell-out growth in the market to be compared to a market that was around 7% of growth, which is a good growth. And this was driven by our skin care business.*

\* \* \*

*The other part, which is the biggest part of our business, it's 70% of our business, it's fragrances. And there, the market is back to growth, and we are growing 2x faster than the market.* So your question is what is needed to compete on this market? Exactly the brands we have at Coty, in fact. There, it's not a question of high, low. *It's all about high, high, high, high. And the higher you go, the better it is. And again, I've been describing at length the very comprehensive portfolio of ultra-premium brands that we have today in our hands.*

Again, Atelier des Fleurs which is phenomenously doing well in Asia, Burberry Signature, BOSS Collection, Jil Sander Signature, Marni and Etro upcoming collection, Infiniment Coty Paris, and I'm sure I forgot 1 or 2, but this is really a portfolio that will allow us to play in this area like never before to reach here not 20% of the market, but likely 40% to 50% of the Chinese market are ultra-premium brands. *So there, there is really a big game to be played with a very, very profitable business to build.*

101.    In discussing a shift in channels for mass beauty, Defendant Mercier had the following exchange with an analyst, in relevant part:

<Q: Anna Jeanne Lizzul – Bank of America Securities> And then on the mass beauty side, I just wanted to follow up on the comment regarding the rapid channel

42

shift. If you could elaborate on where you're seeing buyers gravitate in mass beauty and how it's impacting your business?

<A: Defendant Mercier> *Yes. I mean, just to confirm again, and we shared with you a few numbers. I mean, we are very confident, again, about the prestige fragrance performance and category.* Again, you know the numbers. I mean it has been very resilient for many years, many quarters. The fragrance index that we talked a lot about, I mean, is fully at play. So we are expecting a similar trend for Q1, also amplified by very powerful innovation and BOSS Beyond Bottled is one of them. *We are seeing Gen Z being very excited by the category. And again, back to the previous point, what's very healthy is $5 to $500, where we are seeing the high premium category growing double digit.*

102.    The statements in ¶¶76-83; 91-101 above were materially false and misleading and failed to disclose, *inter alia*, that: (1) the Company's business segments exhibited significant operational inefficiencies; (2) the Company's marketing efforts constricted the margins for its Consumer Beauty Segment; (3) as a result, the Consumer Beauty Segment was underperforming; (4) the Prestige Beauty Segment's growth was slowing; (5) as a result of the foregoing, the Company's assertions concerning its financial and growth prospects were incorrect; and (6) the Company failed to maintain internal controls. As a result of the foregoing, the Individual Defendants caused the Company's public statements to be materially false and misleading at all relevant times.

## The Truth Emerges

### *February 5, 2026 2Q'26 Press Release*

103.    The truth began to emerge on February 5, 2026, when the Company issued a press release for the second quarter Fiscal Year 2026 results (the "2Q'26 Press Release"). The 2Q'26 Press Release revealed the Company's performance for the second quarter came in below expectations, specifically due to issues in the U.S. Prestige fragrance market and Consumer Beauty Segment.

104.    The 2Q'26 Press Release provided a summary of results and a revised outlook,

notably withdrawing the full year Fiscal Year 2026 guidance for EBITDA and decreasing the

Company's near-term outlook, stating in relevant part:

**Six Months Ended December 31, 2025, Summary Results**

For the six months ended December 31, 2025, compared to the six months ended December 31, 2024:

- Net revenue of $3,255.8 million decreased 3% and included a 3% benefit from FX. On a LFL basis, net revenue decreased 6%.

- Reported gross margin of 64.1% decreased 200 basis points year-over-year.

- Adjusted gross margin of 64.3% decreased 180 basis points year-over-year.

- Reported operating income of $333.2 million declined from reported operating income of $506.0 million in the prior year, resulting in a reported operating margin of 10.2%.

- Adjusted operating income of $514.8 million declined 19%. The adjusted operating margin of 15.8%, reflected a 330 basis point decline.

- Adjusted EPS of $0.26 was flat year-over-year, and included a negative impact from the equity swap mark-to-market of $0.07.

- Adjusted EBITDA of $626.3 million decreased 17% year-over-year. The adjusted EBITDA margin of 19.2% reflected a 330 basis point decline.

\* \* \*

**Outlook**

Given the complex beauty market backdrop and Coty's leadership transition, the Company is withdrawing its prior FY26 guidance for EBITDA and free cash flow, and is providing guidance solely for Q3.

Coty expects LFL Q3 revenues to decline by a mid-single-digit percentage, primarily due to weakening in Consumer Beauty sales trends.

\* \* \*

Coty anticipates Q3 gross margins to decline by 200 to 300 basis points year-on year, consistent with Q2 trends. Factoring this gross margin decline, a sizable mechanical impact to fixed costs from the reversal of variable compensation expense, and the Company's commitment to protect A&CP to reignite market share improvement, Coty estimates Q3 adjusted EBITDA of $100 million to $110

44

million, translating to approximately breakeven adjusted EPS excluding the equity swap.

105.    The 2Q'26 Press Release also quoted Defendant Strobel in discussing the Company's performance. Specifically, Defendant Strobel provided context on what the Company's approach was towards addressing the issues leading to the disappointing earnings. Defendant Strobel stated, in relevant part:

In my first month in the role, having visited our largest markets and key sites, it's very clear to me that Coty has many top-notch assets and competitive advantages: highly attractive brands, best-in-class fragrance innovation capabilities, a vertically integrated business model, and a creative, entrepreneurial organization.

***At the same time, our financial performance over the past year and a half has been disappointing, and our current share price reflects that reality. Both things are true: Coty has outstanding assets and capabilities, yet we have not been delivering at the level we should.***

***To step-change our performance and channel our strengths, we are initiating our "Coty. Curated." strategic framework, encompassing sharper priorities, more focused investments, improved execution, and increased support behind our core businesses.*** These actions are anchored in consumer demand and a relentless focus on sell-out and market share.

In parallel, we are continuing our portfolio review to identify opportunities to unlock shareholder value in both the near and long term, complemented by other value-driving opportunities, such as our recent divestiture of our remaining stake in Wella at the end of CY25, delivering on our commitment.

With greater focus and discipline, I believe Coty is well positioned to deliver consistent, profitable growth and realize its full potential.

***February 5, 2026 2Q'26 Earnings Call***

106.    On February 5, 2026, after market close, the Company shared prepared remarks from its earnings call for the second quarter of Fiscal Year 2026 (the "2Q'26 Earnings Call").

107.    During the prepared remarks of the 2Q'26 Earnings Call, Defendant Strobel addressed the lagging results. Specifically, Defendant Strobel stated, in relevant part:

But as I say, if you're so smart, why aren't you rich? There is no denying that Coty's financial results in the past 18 months have been disappointing. The stock has also

been hovering around at $3 for several months, which I see as a signal that investors are skeptical about Coty's long-term ability to compete in beauty, sustain fair market share and deliver consistent profitable growth. Both things are true. ***Coty has outstanding assets and capabilities, but we have not been delivering at the level that we should.***

My takeaway is simple. Our business imperative is to leverage our collective brain power and competitive advantage to deliver the financial and operational performance that reflects Coty's potential. Coty has breadth. Breadth can be a strength, but only when it is curated. This is the foundation of our new strategic framework, Coty. Curated. ***At its core, this means focused investment and sharper priorities. Coty. Curated. is about making big even bigger, scaling what wins, stopping what dilutes and removing layers that slow execution. Ultimately, success hinges on disciplined execution, operational effectiveness and sufficient multiyear marketing support.***

\* \* \*

So how do we break this cycle? ***We will place a much stronger focus on our top markets, brands and initiatives, ensuring they are sufficiently funded and grow year after year. We will refocus investment on the core, ensuring that the more supports the core through built-in halo effects.*** These insights are not revolutionary, but they are fundamental to every beauty and consumer business that delivers long-term success. Fewer assets, better execution, bigger propositions and more supporting the core. We will share more details about Coty. Curated. in the coming quarters.

\* \* \*

***And third, our performance versus the market has been inconsistent. In Prestige fragrances, after lagging the market by 5% to 7% in prior quarters, our fiscal Q1 sell-out was in line with the market. However, in Q2, our sell-out was flattish, underperforming the market by several points in the critical fragrance category.*** In Consumer Beauty, we continue to see a large gap in our sell-out performance relative to U.S. mass cosmetics category, though the recent changes we implemented are starting to show some modest improvement.

108.    Defendant Mercier contributed to the prepared remarks by discussing next steps and near-term outlook. Defendant Mercier stated, in relevant part:

Next steps in the coming months include reinvesting behind key icons, activating evolved brand equities, leveraging AI to scale content creation at a fraction of the cost and reexamining the full value chain. It is worth noting that some of these actions were part of our Consumer Beauty turnaround 5 years ago, including revamping brand equities, platforming innovation and streamlining SKU count.

While these interventions helped stabilize and grow Consumer Beauty several years ago, operational discipline has slipped across the organization over the past 2 years. For example, the number of SKUs in our annual CoverGirl innovation bundle has almost doubled in recent years, significantly increasing cost. We have already materially reduced the SKU count in the fiscal year '26 spring innovation bundle to focus on the highest potential launches. And our fiscal year '27 plans include further streamlining in the CoverGirl innovation SKU count. With Gordon leading end-to-end, the goal is to reinstate the operational discipline and introduce more transformational full value chain change so that progress is durable.

*   *   *

Now let me discuss our near-term outlook. With Markus new to Coty and only 1 month into the role, he needs time to fully immerse himself in the business, understand the underlying dynamics, refine our strategic priorities and align with the Board. Given this leadership transition, it will be premature to issue full second half of fiscal year 2026 guidance at this stage. ***As a result, we are withdrawing full fiscal year guidance which had been previously given for EBITDA and free cash flow***.

### February 6, 2026 2Q'26 Earnings Call Q&A

109.    On February 6, 2026, before the markets opened, the Company conducted the Question-and-Answer portion of its earnings call for the second quarter of Fiscal Year 2026 (the "2Q'26 Q&A").

110.    During the 2Q'26 Q&A, Defendants Mercier and Strobel fielded questions from various analysts surrounding the Company's disappointing results. The exchanges between the analysts and Defendants Mercier and Strobel are as follows, in relevant part:

<Q: Filippo Falorni – Citigroup Inc.> Laurent, on the margin side, Consumer Beauty has been significantly below corporate average. Do you have an aspiration of what their business operating margins can get back to?

<A: Defendant Mercier> ***I mean you heard really from Markus that, number one, there is a clear diagnosis on where we have the gaps and the work that Gordon and the team initiated that in front of each gap, okay, there is a clear action plan.*** So now, of course, it takes some time really to implement these actions. Markus was giving the example of innovation. So the team really has designed really a detailed innovation plan, but this is going to pay off in fiscal '27, okay? But on top of this is, of course, reignite the sellout and then volumes will also reverse the gross margin trend because currently in the gap, there is some fixed cost under absorption. So we have really these elements. ***A lot of work done really on platforming across***

47

*all our great brands. A&CP, detailed work, really how to optimize A&CP. And of course, there is another work on SG&A optimization.* So I'm not going to give you a precise number, but I can tell you that all these initiatives really under high scrutiny, and you will start to see really some improvement in fiscal '27, which will be part of the profit recovery for the global company.

\*   \*   \*

<Q: Olivia Tong Cheang – Raymond James & Associates > Markus, I was wondering if you could give some views on your assessment of the internal controls of the company and sort of prioritization, what's your starting point? Because is it the brand, the marketing, innovation, SKU management, IT, it sounds like it's all of the above. So do you think this is a company in need of significant reinvestment? Are there costs that you can take out? And I guess, most importantly, do you trust the answers that the analytics are providing?

<A: Defendant Strobel> *What we are missing a bit is the operational discipline to bring this to market in a way that is sequenced, that is properly funded and that is well thought through in agreements return in the plans we go to market.*

\*   \*   \*

*It's very hard to do, to change the mindset of the organization on this one and put the processes in and the data and the analytics. That's where we spend a lot of time these days, how do we get to one source of truth and every aspect about our business.* So when we talk about service to customers, what is the one number that tells us, are we meeting service to customers? What is the one number that tells us are we meeting offtake and market share expectations? So we spend a lot of tim in, at the moment, data and AI to really build out our data lake to make sure we have the right questions, the right answers, the right hypothesis and come up, come up with the right action. So you're right, there's a lot of investment needed in this space, and we're making these investments.

\*   \*   \*

<Q: Charles-Louis Scotti – Kepler Cheureux, Research> The first one, could you please provide us more granularity on the expected mid-single-digit sales decline in Q3? It appears that the Consumer Beauty will remain the main drag, but Prestige Beauty comps become significantly easier in Q3 and apparently, inventories are healthier. And despite that, it seems that there will be a sequential deterioration in Q3. So what's explaining this dynamic? And more broadly, what's driving the gap between consumer and your own expected top line growth? Is it destocking or market share losses?

<A: Defendant Mercier> So indeed, on the Q3, mid-single digits. *So as we indicated, I mean, it's -- the main headwind is from Consumer Beauty. And indeed, as we shared just before, I mean, we are really still in a phase of that we know where the gaps are. The team is really putting in place all these actions, but*

48

*it takes time.* And indeed, we are still in this phase where the example that too many innovations, then we had to take some returns in some cases. So it's still hurting the top line, and this is something that indeed we are managing.

\* \* \*

So there are also some parts where we are deprioritizing, okay? So it may -- it's weighing on the net revenue, but for good reasons, okay, it's really with this approach that it will pick up and then it will improve the gross margin and it will improve the profitability. ***So there is the dimension that you need to consider in Q3 for Consumer Beauty. But at the same time, we are starting to see some green shoots. Markus was referring to CoverGirl, Simply Ageless, Lash Blast, I mean, are doing good.*** So we need really to amplify these initiatives. But again, it takes time.

\* \* \*

<Q: Oliver Chen – TD Cowen> On the Consumer Beauty side, given the strategy edits here, should we expect it to get worse and worse before it gets better just in order to conduct that reset? And also, as you think about Consumer Beauty, what specific innovation are you most -- feeling most confident about that we should focus on?

<A: Defendant Strobel> ***On Consumer Beauty, I think I would not -- I think things will get better. This quarter for us is difficult as we are really changing the way the go-to-market, sharper bundles, better focus on the base business.*** It will take some time, but I would not characterize this going -- getting from worse to worse. It will not be easy. It will take some time, but it will get better. I'm pretty much convinced of this. I've seen the plans.

I have seen the way the team is defining the activities of the brand to both appeal to a modern consumer, but also make sure that our heritage consumer is being protected and keeps loving our brands. So I'm very excited about that. We have good innovation coming up. We have strong innovation coming up on our core franchises, on the Simply Ageless, on the Lash Blast, but also on new items, more trend items like skin tints and all these things that are currently being requested by the market. So we're on it. So I guess the bundle that we're going to bring out the fiscal '26 bundle is going to be good, much better than before. The fiscal '27 bundle will be great.

111.    On this news, the price of the Company's common stock fell $0.49 per share, or approximately 15.6%, from a closing price of $3.15 per share on February 5, 2026, to close at $2.66 per share on February 6, 2026. Over the course of the Relevant Period, the price of the Company's common stock fell $2.20 per share, or approximately 45.2%, from a closing price of

$4.86 per share on August 20, 2025, to close at $2.66 per share on February 6, 2026.

**DAMAGES TO COTY**

112.    As a direct and proximate result of the Individual Defendants' conduct, Coty will lose and expend many millions of dollars.

113.    Such expenditures include, but are not limited to, legal fees associated with the Securities Class Action filed against the Company, its former CEO, and its CFO, any internal investigations, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

114.    Such expenditures also include, but are not limited to, fees, costs, and any payments for resolution of or to satisfy judgements associated with any other lawsuits filed against the Company or the Individual Defendants based on the misconduct alleged herein, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

115.    Such expenditures will also include costs incurred in any internal investigations pertaining to violations of law, costs incurred in defending any investigations or legal actions taken against the Company due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations.

116.    Additionally, these expenditures include, but are not limited to, compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

117.     As a direct and proximate result of the Individual Defendants' conduct, Coty has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

**DERIVATIVE ALLEGATIONS**

118.    Plaintiff brings this action derivatively and for the benefit of Coty to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Coty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act.

119.    Coty is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

120.    Plaintiff is, and has been at all relevant times, a shareholder of Coty. Plaintiff will adequately and fairly represent the interests of Coty in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

**DEMAND FUTILITY ALLEGATIONS**

121.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

122.    A pre-suit demand on the Board is futile and, therefore, excused. When this action was filed, Coty's Board consisted of the following ten individuals: Defendants Capel, Creus, Engelen, Singer, and Strobel (the "Director-Defendants"), and non-parties Carsten Fischer ("Fischer"), Alia Gogi ("Gogi"), Robert Kunze-Concewitz ("Kunze-Concewitz"), Maria Carla Liuni ("Liuni"), and Stephanie Plaines ("Plaines") (together with the Director-Defendants, the "Directors"). Plaintiff needs only to allege demand futility as to five of the ten Directors that were on the Board at the time this action was filed.

123.    Demand is excused as to all of the Director-Defendants because each of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme

they engaged in knowingly or recklessly to make and/or cause the Company to make the materially false and misleading statements alleged herein. This renders the Director-Defendants unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme. Thus, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

124.    In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly caused or permitted Coty to issue materially false and misleading statements. Specifically, the Director-Defendants caused Coty to issue false and misleading statements which were intended to make Coty appear more profitable and attractive to investors. Moreover, the Director-Defendants caused the Company to fail to maintain internal controls. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested or independent, and demand upon them is futile, and thus excused.

125.    Additional reasons that demand on Defendant Strobel is futile follow. Defendant Strobel has served as a director and Executive Chairman of the Board since January 1, 2026. He has also served as Interim CEO since January 1, 2026. The Company provides Defendant Strobel with his principal occupation for which he receives lucrative compensation. Thus, he is a non-independent director. As the Company's highest officer, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets For these reasons, Defendant Strobel breached his fiduciary duties, faces a substantial likelihood of liability, is not independent

or disinterested, and thus demand upon him is futile and, therefore, excused.

126. Additional reasons that demand on Defendant Capel is futile follow. Defendant Capel has served as a Company director since January 1, 2026. She also serves as a member of the Remuneration and Finance Committee. Defendant Capel receives lucrative compensation for her role as a director. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons, Defendant Capel breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

127. Additional reasons that demand on Defendant Creus is futile follow. Defendant Creus has served as a company director since 2019. Defendant Creus has received and continues to receive lucrative compensation for his role as a director. Furthermore, he solicited the 2025 Proxy Statement, which contained false and misleading statements and contributed to the re-election of Defendants Nabi, Ballini, Engelen, Harf, Makanju, Parize, Singer, and von Bretten, and himself to the Board, thereby allowing them to continue to breach their fiduciary duties to the Company. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Creus breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

128.    Additional reasons that demand on Defendant Engelen is futile follow. Defendant Engelen has served as a Company director since November 6, 2025. Defendant Engelen receives lucrative compensation for his role as a director. Furthermore, he solicited the 2025 Proxy Statement, which contained false and misleading statements and contributed to the re-election of Defendants Nabi, Ballini, Creus, Harf, Makanju, Parize, Singer, and von Bretten, and himself to the Board, thereby allowing them to continue to breach their fiduciary duties to the Company. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Engelen breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

129.    Additional reasons that demand on Defendant Singer is futile follow. Defendant Singer has served as a Company director since 20010. Defendant Singer serves as a member of the Audit Committee. Defendant Singer has received and continues to receive lucrative compensation for his role as a director. Furthermore, he solicited the 2025 Proxy Statement, which contained false and misleading statements and contributed to the re-election of Defendants Nabi, Ballini, Creus, Engelen, Harf, Makanju, Parize, and von Bretten, and himself to the Board, thereby allowing them to continue to breach their fiduciary duties to the Company. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Singer breached his fiduciary duties, faces a

substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

130. Additional reasons that demand on the Board is futile follow.

131. Defendant Singer served as a member of the Audit Committee at all relevant times. As such, he was responsible for the effectiveness of the Company's internal controls, the truth and accuracy of the Company's financial statements, and the Company's compliance with applicable laws and regulations. During the Relevant Period, he violated the Audit Committee Charter by engaging in or permitting the Company to engage in the dissemination of materially false and misleading statements to the public and to facilitate the Individual Defendants' violations of law, including breaches of fiduciary duty and violations of the Exchange Act; failed to adequately exercise his risk management and risk assessment functions; and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and Code of Conduct. Thus, Defendant Singer breached his fiduciary duties, is not independent or disinterested, and thus demand is excused as to him.

132. In violation of the Code of Conduct, the Director-Defendants engaged in or permitted the scheme to cause the Company to issue materially false and misleading statements to the investing public, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act. In addition, the Individual Defendants violated the Code of Conduct by failing to act with integrity, failing to avoid conflicts of interest, failing to ensure the Company's disclosures were accurate, failing to ensure the Company complied with applicable laws, rules, and regulations, and failing to promptly report known violations of the Code of Conduct and the law. Thus, the Director-Defendants breached the

Company's own Code of Conduct, are not disinterested, and demand is excused as to them.

133. Coty has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director-Defendants have not filed any lawsuits against themselves or any others who were responsible for the wrongful conduct to attempt to recover for Coty any part of the damages Coty suffered and will continue to suffer thereby. Thus, any demand upon the Director-Defendants would be futile.

134. The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director-Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

135. The acts complained of herein constitute violations of fiduciary duties owed by Coty's officers and directors, and these acts are incapable of ratification.

136. The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Coty. If there is a directors' and officers' liability insurance policy covering the Director-Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director-Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the

Director-Defendants were to sue themselves or certain of the officers of Coty, there would be no directors' and officers' insurance protection. Accordingly, the Director-Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director-Defendants is futile and, therefore, excused.

137. If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause Coty to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

138. Thus, for all of the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least five of the Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

### FIRST CLAIM
**Against Defendants Nabi, Ballini, Creus, Engelen, Harf, Makanju, Parize, Singer, and von Bretten for Violations of Section 14(a) of the Exchange Act**

139. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

140. Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security)

registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

141. Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

142. Under the direction and watch of Defendants Nabi, Ballini, Creus, Engelen, Harf, Makanju, Parize, Singer, and von Bretten, the 2025 Proxy Statement failed to disclose that: (1) though the Company claimed its officers and directors adhered to the Code of Conduct, the Individual Defendants violated these policies either without waivers or without such waivers being disclosed; and (2) contrary to the 2025 Proxy Statement's descriptions of the Board's and its committees' risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements.

143. The 2025 Proxy Statement also failed to disclose that: (1) the Company's business segments exhibited significant operational inefficiencies; (2) the Company's marketing efforts constricted the margins for its Consumer Beauty Segment; (3) as a result, the Consumer Beauty Segment was underperforming; (4) the Prestige Beauty Segment's growth was slowing; (5) as a result of the foregoing, the Company's assertions concerning its financial and growth prospects were incorrect; and (6) the Company failed to maintain internal controls. As a result of the foregoing, the Individual Defendants caused the Company's public statements to be materially false and misleading at all relevant times.

144. In exercise of reasonable care, Defendants Nabi, Ballini, Creus, Engelen, Harf,

58

Makanju, Parize, Singer, and von Bretten should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2025 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on matters set forth for shareholder determination in the 2025 Proxy Statement, including but not limited to the re-election of directors to the Board.

145.    The false and misleading elements of the 2025 Proxy Statement led to, among other things, the re-election of Defendants Nabi, Ballini, Creus, Engelen, Harf, Makanju, Parize, Singer, and von Bretten to the Board, which allowed them to continue to breach their fiduciary duties to the Company.

146.    The Company was damaged as a result of Defendants Nabi's, Ballini's, Creus', Engelen's, Harf's, Makanju's, Parize's, Singer's, and von Bretten's material misrepresentations and omissions in the 2025 Proxy Statement.

147.    Plaintiff, on behalf of Coty, has no adequate remedy at law.

**SECOND CLAIM**
**Against the Individual Defendants for Breach of Fiduciary Duties**

148.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

149.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Coty's business and affairs.

150.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

151.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the

59

rights and interests of Coty.

152.    In breach of their fiduciary duties owed to Coty, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements and omissions of material fact that failed to disclose, inter alia, that: (1) the Company's business segments exhibited significant operational inefficiencies; (2) the Company's marketing efforts constricted the margins for its Consumer Beauty Segment; (3) as a result, the Consumer Beauty Segment was underperforming; (4) the Prestige Beauty Segment's growth was slowing; (5) as a result of the foregoing, the Company's assertions concerning its financial and growth prospects were incorrect; and (6) the Company failed to maintain internal controls. As a result of the foregoing, Coty's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

153.    In further breach of their fiduciary duties, the Individual Defendants failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and/or omissions of material fact referenced herein, which renders them personally liable to the Company for breaching their fiduciary duties.

154.    Also, in breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls.

155.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to issue materially false and misleading statements, and they failed to correct the Company's public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even

though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

156. These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

157. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Coty has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

158. Plaintiff, on behalf of Coty, has no adequate remedy at law.

### THIRD CLAIM
**Against the Individual Defendants for Unjust Enrichment**

159. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

160. By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Coty.

161. The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Coty that was tied to the performance or artificially inflated valuation of Coty, or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct.

162. Plaintiff, as a shareholder and representative of Coty, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by

the Individual Defendants due to their wrongful conduct and breaches of their fiduciary duties.

163.    Plaintiff, on behalf of Coty, has no adequate remedy at law.

### FOURTH CLAIM
### Against the Individual Defendants for Abuse of Control

164.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

165.    The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Coty, for which they are legally responsible.

166.    As a direct and proximate result of the Individual Defendants' abuse of control, Coty has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

167.    Plaintiff, on behalf of Coty, has no adequate remedy at law.

### FIFTH CLAIM
### Against the Individual Defendants for Gross Mismanagement

168.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

169.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Coty in a manner consistent with the operations of a publicly held corporation.

170.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Coty has sustained and will continue to sustain significant damages.

171.    As a result of the misconduct and breaches of duty alleged herein, the Individual

Defendants are liable to the Company.

172.   Plaintiff, on behalf of Coty, has no adequate remedy at law.

## SIXTH CLAIM
**Against the Individual Defendants for Waste of Corporate Assets**

173.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

174.   As a further result of the foregoing, the Company will incur many millions of dollars of legal liability and/or costs to defend unlawful actions (as evidenced, for example, by the Securities Class Action), to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

175.   As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

176.   Plaintiff, on behalf of Coty, has no adequate remedy at law.

## SEVENTH CLAIM
**Against Defendants Nabi and Mercier for Contribution Under Sections 10(b) and 21D of the Exchange Act**

177.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

178.   Coty and Defendants Nabi and Mercier are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendants Nadi's and Mercier's willful and/or reckless violations of their obligations as officers and/or directors of Coty.

179.   Defendants Nabi and Mercier, because of their positions of control and authority as

63

officers and/or directors of Coty, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of Coty, including the wrongful acts complained of herein and in the Securities Class Action.

180.    Accordingly, Defendants Nabi and Mercier are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

181.    As such, Coty is entitled to receive all appropriate contribution or indemnification from Defendants Nabi and Mercier.

### PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)    Declaring that Plaintiff may maintain this action on behalf of Coty, and that Plaintiff is an adequate representative of the Company;

(b)    Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Coty;

(c)    Determining and awarding to Coty the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)    Directing Coty and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Coty and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions

for amendments to the Company's Bylaws or Articles of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2. a provision to permit the shareholders of Coty to nominate at least five candidates for election to the Board;

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations;

(e)     Awarding Coty restitution from the Individual Defendants, and each of them;

(f)     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)     Granting such other and further relief as the Court may deem just and proper.

**<u>JURY DEMAND</u>**

Plaintiff hereby demands a trial by jury.

Dated: April 9, 2026

Respectfully submitted,

**THE BROWN LAW FIRM, P.C.**

*/s/ Timothy Brown*
Timothy Brown
Saadia Hashmi

65

Elizabeth Donohoe
Zachary Benson
767 Third Avenue, Suite 2501
New York, NY 10017
Telephone: (516) 922-5427
Fax: (516) 344-6204
Email: tbrown@thebrownlawfirm.net
        shashmi@thebrownlawfirm.net
        edonohoe@thebrownlawfirm.net
        zbenson@thebrownlawfirm.net

*Counsel for Plaintiff*

## **VERIFICATION**

I, Guy Moar, am a plaintiff in the within action. I have reviewed the allegations made in this Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 6th day of April 2026.

Signed by:

487C6BCFB075453...

Guy Moar